So our second case today is Adams v. School Board of St. Johns County. Mr. Slanker, come speak with us. Thank you, Your Honor. May it please the Court. My name is Jeff Slanker. I'm here with my law partners, Terry Harmon, Rob Sniffen, and Michael Spellman, on behalf of the School Board of St. Johns County, Florida. And I thought it would be appropriate today to focus on the issues that this Court has to be briefed, and that's whether the School Board's policy of separating bathrooms based on sex violates Title IX or the Equal Protection Clause. So we've argued in our papers it does not. I want to be clear what the policy is all about, and what the policy has been in St. Johns County schools for as long as anyone could remember. And that is that sex, and when I say sex, I mean the traditional understanding of sex, the biological sex of individual students, is what dictates the bathroom that those students must use. So biological females must use the women's restrooms. Counsel, I'm sorry to interrupt, but wasn't there expert testimony, and weren't there facts found about what biological sex is, that it actually consists of several different things, and they might not always align for a single gender? There might have been specific, there might have been expert evidence on that particular point. Again, I'm not, I don't remember exactly what the finding was as to that, but I think that Was it found, I mean, are you arguing that it was clearly erroneous? We're arguing that there was a finding of fact that Mr. Adams was a biological female, and we're arguing that what dictates the policy here, and what must be measured, isn't what expert evidence submitted on the nature of sexuality is, and what it means, and how it's involved, but whether the school district's definition of sex, how the school district decides to define sex, whether that substantially advances an important governmental interest. I'm sorry. And whether that I'm a little confused. Sure. I understand that there was a finding of fact that Mr. Adams was assigned female at birth, but my understanding is the district court found that he was a male, biologically, however you want to describe it, and that is because of the medical evidence that there was that talked about all different kinds of ways of construing sex. So there's the birth assigned sex, there's chromosomal sex, there's neurologic sex, there's hormonal sex, et cetera, and that based on the testimony of the experts, that Mr. Adams was found to be a boy. Have I misunderstood this? I think there was expert testimony that Mr. Adams was a boy. I think there was a finding. I think the most precise way to say it is that regardless of what any expert testified to, what any medical expert testified to, what's being measured is not necessarily anything particular as to Mr. Adams himself, but it's what the school board's classification is. That's what's measured. What equal protection and jurisprudence talks about is does the classification used, does that advance an important governmental interest? And I'm explaining what the classification used is on the part of the school board, and that classification is that the school board separates bathrooms based on a traditional understanding of sex. Well, let's just accept that position for a moment, that when we're talking about sex, we're talking about birth assigned sex, okay? Why is it not the case, then, that that policy discriminates against transgender students? And why isn't transgender a quasi-suspect class as, for example, the Fourth Circuit found in Grimm? Well, Your Honor, I don't think that this case necessarily implicates or concerns the question of whether transgender status is a quasi-suspect class or is not a quasi-suspect class. Why is that? Because the school boards, and this has been the school board's position from day one, the school board's position is, sure, this is a sex-based classification. It's overtly a sex-based classification. We say boys must go to the boys' room and girls must go to the girls' room. But that's neither here nor there. I mean, the question here is whether the policy discriminates against transgender students. And isn't it the case that under the policy that transgender students have to use either the birth assigned sex bathroom or a unisex bathroom? And that Ms. Smith testified that the school board actually wants transgender students to use the unisex bathroom. Isn't that what was testified to? I can't remember the specific testimony as to Ms. Smith. Well, let's just assume that that's what she testified to. Okay. All right. So that being the case, why wouldn't, why isn't that discriminatory towards transgender students? In other words, why wouldn't the school district adopt a similar policy to what hundreds of other school districts and some states as a whole have adopted, which is students use the bathroom of their, of their, the gender that they identify with. And if any student is uncomfortable, any student can use the unisex bathroom. That does not single out any particular, it doesn't single out birth assigned boys, doesn't single out birth assigned girls, doesn't single out transgender students. Why isn't that the neutral policy that should be applied as opposed to one that discriminates against students who are transgender? Well, I wouldn't, I don't concede, and we don't contend that the policy discriminates against students. Counsel, can I ask you a question? We're talking about bathrooms, but can we talk about showers? Because the bathrooms here also include... I'm not sure that counsel's had an opportunity to answer the last question from Judge... Thank you, Chief. ...Rosenbaum, but you'll have the next one. And let me just get reoriented. I apologize, Judge Rosenbaum. I wouldn't concede that the policy discriminates against any student based on transgender status. And that's because it's, it doesn't necessarily follow in my mind that a sex-based classification has anything to do with transgender status or gender identity. The policy, in this case, had nothing to do with Mr. Adams' gender identity or any student's gender identity. Here's why I'm confused. You are saying, I think, if I'm wrong, you just correct me because maybe I'm misunderstanding. I'm understanding your position to be that when you're talking about sex, you mean birth assigned sex. Isn't that right? We mean biological sex, the real... I mean, I'm trying to be specific here. I want to make sure I understand what you mean because biologic sex is something that, you know, the medical professionals prefer not to use because it's not very precise because there are so many things that go into determining sex. And so I'm trying to be precise. Do you mean birth assigned sex? We mean, it's referred to as birth assigned sex. That's my understanding. Okay. It is, it means biological sex. Okay. The real differences between men and women and the policies apply to irrespective of any student's gender identity. It applies to all students throughout the school board and all the school board schools. But... Judge Lagoa was next. Judge Wilson can ask a question. Okay, good. I guess one of the concerns that I have is that when you look at the language of Title IX, it doesn't preface the word sex with biological. It just uses the word sex. What do we make of that? Your Honor, I would submit that that term, sex, must be interpreted according to the ordinary common meaning of the word sex at the time Title IX was enacted, which was in 1972. I mean, when we look at Title VII, Title VII prohibits discrimination. It uses just the word sex and it prohibits discrimination against motherhood, sexual harassment. Why can't we analogize Title VII to Title IX? I think that in light of FOSTA, certainly an argument can be made that the term sex, if it's operated very mechanistically, can encompass some form of transgender status. Don't we have to say that sex, that this, your policy discriminates on the basis of sex? And the same way that Bostock said it does, but there is a difference. There's an exception, Your Honor. There is a carve-out in Title IX that is not in Title VII. Yeah, and on the Title IX point, you know, that's exactly right. The statute itself permits separate living facilities based on sex, and the implementing regulations permit school boards and school and educational institutions, I should say, to separate toilet facilities, locker rooms, shower facilities on the basis of sex. So that's something that's different from Title VII because Title VII and the Bostock case concerned just the very narrow issue of if you terminate someone because of their transgender status, is that discrimination? But there was no type of similar exception at play. Well, and isn't there also another difference between Title VII and Title IX in the sense that Title IX is a spending clause statute, and the Supreme Court, for better or worse, has said that spending clause statutes require some sort of clear statement about what the recipient of federal funds is sort of signing up for? Yes, Justice Gershom, I think that's correct, and it's what we've argued in our papers. And I think what's worth doing is kind of thinking about the interpretation that Mr. Adams has advanced in this case, and he wants this Court, in light of these spending clause implications and the fact that the Supreme Court has said spending clause cases, conditions on accepting federal funds must be clearly stated to say that a statute that says you may, in implementing regulations that say you may separate living facilities, showering facilities, toilets on the basis of sex, means that school boards must separate those based on gender identity. We know from Bostock, those are two distinct concepts. Can I ask you a slightly less friendly question? The justification here for separating based on what I'll call anatomical sex is privacy. Would the same justification hold for a fully anatomically transitioned student? This student hadn't fully anatomically transitioned, as I understand. No. Would the same privacy justification hold for a student who had fully anatomically transitioned? Your Honor, I can't necessarily answer how the school board would treat that instance just because not of record, not sure how the policy would actually implement it. I think it would be a case-by-case decision for the school to handle. I would note that the likelihood, I think, in that case, of that being the case, excuse It's my understanding the WPATH guidelines only recommend full transition and confirmation surgery after the age of majority in our state. Majority is 18. What if he had surgery and had some anatomical changes between the 11th and the 12th grade? Would he be required under those circumstances to switch bathrooms? Your Honor, I can't answer that necessarily. I can't answer whether or not the policy provides guidance. Does the policy say anything about that? The policy is fairly simple. It just says that biological males must use the men's room and biological women must use the women's room. So I think that that is really, it would be a very What if you're a transgender male and you mark the box for that on your enrollment papers at St. John's High School when you enroll? Then you're using the boys' bathroom for the remainder of your high school career. Isn't that right? Well, not necessarily for the remainder of your high school career. What the school board lawyer said is that if that was the situation, if someone had I want to make sure I'm understanding your The enrollment papers control Indicated men. Right. Until there's a reason to believe that someone is using the bathroom that doesn't match their biological sex. Where's that in the record? Mr. Upchurch, the school board attorney, testified to that. He said But the district court didn't credit that part of the testimony. The district court's finding, right or wrong, is that you said that the policy was based on sex determined at birth. But the district court found, based on the testimony of the school board's own witnesses, that the practice on the ground is different. So if you enroll as an 8th grader or an 11th grader in the school board system and you're a transgender student and you identify as the gender you are transitioning to, the school board takes that at face value. And here's what the district court said. The school district has no process to determine if a student is transgender. So as I see this case, it doesn't present the big, broad questions of whether or not a school board has to allow transgender students at any stage to use any bathroom of choice. The question is whether or not the school board's policy rationally discriminates against Mr. Adams. Because if you take Mr. Adams' situation and you take a student just like Mr. Adams, but who enrolled as a 10th grader for the first time, they moved from, let's say, Tennessee, and that student is transitioning from male to female or female to male, and they put in the new gender on their enrollment forms, the school board says, yeah, you can use your new gender identity bathroom, not a problem. And so that person is treated exactly differently from Mr. Adams because Mr. Adams, when he enrolled in second grade kindergarten, was enrolled, as Judge Newsom put it, as anatomical birth in terms of sex. And so the question is, if you're allowing the new student who self-identifies as the new gender or sex, I know we're using these concepts interchangeably because of the difficulty in concepts, but identifies as what he or she is transitioning to, and they tell that student, you can use that bathroom for that gender, not a problem. How is that rationally treating Mr. Adams? That's just administrative convenience, and that can't possibly satisfy the Equal Protection Clause. Tell me where I'm wrong. Am I wrong factually? Well, Your Honor, I can't recall specifically, and I'll look at the district court decision in terms of whether— That's an important point to not know. Well, I'd like to sit down— Because you said the policy is strictly based on sex determined at birth. The district court's findings say otherwise. Well, what the district court found was that the policy did separate bathrooms based on biological sex and sex determined at birth, whatever term you want to use, I think that— But it also has this finding I just quoted to you. It's a full paragraph on what the school board officials testified to, that if a new student comes in, self-identifies as the new gender they're transitioning to, they're allowed to use the bathroom for that new gender without checking. Judge Jordan, it was also a finding, a fact of the district court, that what the school board attorney testified to was that the method of determining sex— I want to be clear that the method of determining sex and using enrollment materials as a proxy for biological sex, that's the enforcement mechanism or the means. It's not the actual classification that's being tested. But what the school board attorney said is— Explain that difference to me. If you're allowing the student to use the bathroom of self-identified gender, how can that policy be based on anatomical sex at birth? Well, the school board attorney testified, again, I believe this is a finding, a fact, that if the method of relying on enrollment materials proved to be ineffective, that it would be revisited. And there's no evidence in this case that it wasn't perfectly effective, that it didn't operate to perfectly classify every student in the school district. So I think we've got to think about what the actual— Thus, unless there is a complaint, a transgender student can use the restroom matching his or her gender identity until he or she graduated, and the school would be none the wiser. Well, I think that unless there is a complaint, unless there was something that would put the school board on notice that someone was using the bathroom that didn't align— But the school board doesn't really care much about that policy then, right? Do you think it would be well-received for the school board to perform an examination of every student individually to ensure that the bathroom policy was followed in a way that might satisfy with more precision? Judge Grant, I mean, as a practical matter, what the testimony was, was that we're not going to play bathroom cop. We're not going to— My suggestion is not a physical examination, which would be incredibly intrusive. I agree with Judge Grant. But you can certainly ask for the birth records, and you can match the birth record to the enrollment record. And you can say your enrollment record— Are they not? Birth certificate is required as part of the enrollment process, whether you're in high school or you're in elementary school or middle school. Yes, Judge Jordan, and there has been— And it has to be certified, I believe, in Florida. Adam's birth record now says he's a boy now, doesn't it? I believe that he changed his birth certificate to, say, male, but his enrollment materials indicate female, and birth certificates, of course, would be part of a student's cumulative file. And I will say that this hypothetical or this notion that someone might transfer into the school board and there be no indication to the school board that there's an inconsistency in the materials, I don't—it's certainly not borne out in the record. I don't think it's— So you're saying there's no evidence that it ever actually happened? No, and I don't think practically, Judge, that it could happen just because when a student transfers— Okay. If Judge Jill Prior has a question, you've gone considerably over. I'm trying to get things moving along. I'll try to be quick, Chief. I want to go back to Judge Wilson's question for a minute, and I just want to make sure I understand what the school board is saying. So you have a person who enrolled as a female as a young child, comes out before high school as transgender, goes through everything that person can do to change gender except for bottom surgery, which is not permitted because he's not 18. So he speaks with a deep voice because of hormones. He's fully developed in the chest area, you know, like a boy would be. He wears boys' clothes. He has a boy's haircut. He has facial hair. That person is required by school board policy to use the girls' bathroom, is that right, or the general neutral bathroom. But he can use the girls' bathroom. Correct. That's what I understand in the policy judgment. So by all outward appearances, this person who walks into the bathroom is male, and yet he can use the girls' bathroom. Well, the policy makes a distinction based on the traditional notions of sex, and I think I want to reiterate that that is what's being tested here. And the fact that there's maybe a hypothetical out there that could potentially exist that doesn't invalidate the entirety of the policy. Well, that's actually Mr. Adams' situation though, right? Well, what I've heard is that this is an as-applied challenge. I don't see how that's relevant even to Mr. Adams at all. It's undisputed that Mr. Adams' enrollment paperwork indicated his female sex. Thank you for the clarification. Appreciate it. Any questions? Okay. Mr. Slanker, you've saved five minutes for rebuttal. We'll hear next from Ms. Borelli. May it please the Court. Tara Borelli with Lambda Legal on behalf of the appellee, Andrew Adams. I'll begin today with the equal protection claim, and Ms. Hecker will focus on Title IX on behalf of the United States, but we are both prepared to answer all of the Court's questions. I'll begin by addressing some of the points that my colleague talked about during his opening argument. I do want to underscore the testimony that exists in the trial record about the term biological sex. The Court is correct that that term is not viewed to be medically accurate by physicians, experts in the field, because there are multiple sex-related characteristics and they don't all align. And so it's a term that experts and physicians simply don't use because it's not accurate. That was unrebutted testimony, and this points to an argument about why it fits so squarely within the mold of Bostock. So when Mr. Slanker says this is the basis for the distinction, this is the basis for the discrimination, that tells us precisely why Bostock applies. Andrew Adams is treated differently because he was identified as one sex at birth, and he identifies as male today. That is precisely what Bostock says is impermissible sex discrimination. Will you explain that to me? How is he treated differently? I'll just play that out. The school board's witnesses admitted that there are at least two ways that he's treated differently. The first one is that unlike other boys, all of whom can use the restrooms matching their male identity, he cannot. Second, unlike all other non-transgender students who can use common restrooms that match their gender identity, he is effectively isolated from his peers by being relegated to gender-neutral restrooms. This goes to another important point that was discussed a moment ago, which is the court is absolutely correct. Under the school board's policy, there is absolutely no dispute that they said it's appropriate for Andrew Adams, who is recognized as male in every respect, whose secondary sex characteristics are male, who the state of Florida says is male, whose doctors say is male, all of his peers recognize him as male. The school's policy would send him into the girls' restroom. Can I ask you just a question about sort of what form of proof you would concede a school board can demand of transition? Like there you were sort of rattling off this sort of litany of things that confirm his status as a boy. But surely you wouldn't say that a school board just has to take a student's say-so. No, and actually— So what can a school board demand in your view? The school board actually has a very reasonable policy in place right now, and this is in the best practices. So the best practices have a standard that run throughout them, and that standard is consistently asserted gender identity. And that is the standard the school— That sounds an awful lot like say-so to me. Consistently asserted, is that what you said? Correct, and we have some testimony in the trial record about how that's played out in other schools. Well, how can you—what happens when you have a gender-fluid student who is anatomically, biologically a male and identifies on Monday as a female and wants to use the restroom? Let me make sure to come to that question, Your Honor. But to make sure that I've answered this question about consistently asserted gender identity, the trial testimony from officials at Broward County who've had a policy in place for many, many years now, they're the sixth largest school district in the nation. What they do is they make sure that the request is genuine. Now, the trial record showed that no one had ever uncovered any problems with pretenders. It simply isn't an issue that even the school's own LGBT task force uncovered. But they have a safeguard in place for it regardless, that safeguard of consistently asserted gender identity. The way that plays out in Broward County is just one example. Principal Kaffer testified, we talk to the student, we talk to the family. It's not a situation where a student can show up on day one and say, I feel like this, now let me into a space. We make sure that this is a genuine request, that the student has a transition plan, and there are a variety of indicia that we can secure from documents, from the parents, from a variety of sources to make sure that this is a genuine request and one that's consistently being asserted. Now, again, that's the school's own standard that they selected after their own process of research. They apply it now for purposes of dress code and purposes of pronouns. That's a perfectly reasonable line. All they have to do is apply it to the very same students that they already used that standard to respect. To follow up on Judge Lagoa's question, why wouldn't that policy by your own lights discriminate against gender-fluid students? So Sally Ann Smith, the retired director of student services, was asked about this at trial. This was something she testified about as one of the reasons that the school couldn't provide equal treatment to Andrew Adams, who, again, is the only student protected by this judgment. And she said, we're concerned about gender-fluid students. And the questions were, you undertook a process of study through your task force over a period of years. That's not what I'm asking. I'm asking why, by your definition of discrimination, this policy wouldn't discriminate against gender-fluid students. This is a quite different case. The school has a rule in place right now that says boys use the boys' restroom only. Girls use the girls' restroom only. Andrew Adams is asking for equal treatment under that principle. I understand, but I'm asking you a different question, which is why the policy wouldn't discriminate against gender-fluid students. Your Honor, I'm not sure what that claim would look like or what a remedy would look like that a student might be seeking, but that's very different from a student who says, I am a boy and I want to use the boys' restroom only. It's absolutely different, but I'm wondering why the same principle wouldn't apply in that case under your argument. I'm not sure I see how that would be different. I understand how it's different in these facts, but I'm not sure how it's analytically different. Can you explain why it would be analytically different? So I think that claim, and, again, I'm a little bit unclear, and I don't know if the Court has an idea of what the remedy might be that a student would be seeking in that circumstance. But what the school has is a very simple system. There are boys' restrooms. There are girls' restrooms. If there's a student that's uncomfortable with either of those, there are gender-neutral restrooms. Would we have to answer that question given an as-applied challenge to the policy in this case? Would we have to answer that question? Not at all. And, again, Ms. Smith was pressed and said, did you uncover any issues with that? You've studied school districts across the country that provide equal treatment to transgender students. She was asked two times, did you uncover any problems with that issue? And she said, no, no problems. We never discovered that through our research. Let me follow up on that. There's a focus both that you have done in your briefing and that the district court did when looking at the government interest in this policy in saying, but there's no evidence of that. That's a concern that the government has, but there's no evidence of any predatory behavior that's happening as a result of allowing people who are transgendered into bathrooms. And there's a lot of time spent talking about that this is someone who was born female who is transitioning and wants to use the boys' bathroom. But it could also apply to a situation where someone is born a boy who wants to use the girls' bathroom, where there's a physical threat that would be different in that case. A lot is made of the fact that, oh, there are stalls. But there are also urinals that boys can be seen in. And if we apply it to the girls' room, girls change outside of stalls. So there are some governmental interests at play here. But it seems to me that the district court and that you also in your briefing, why do we have to discount the government interest because there's no evidence that these concerns have happened? Perhaps, in fact, these concerns have not been realized because the policy exists as it is right now. Your Honor, let me make sure I take the several points in that question. So first, just on the narrow point of urinals, the school admitted that they can install partitions if they want to, and they've disclaimed cost as an interest. And so if they want to have partitions for urinals, if they think that would provide a greater measure of privacy, they should do that. They've admitted that they can. Maybe they don't want to because it's expensive. They've disclaimed cost explicitly. Do we have to rely on the judge's factual findings here? I'm so sorry, I didn't catch that question. Do we have to rely on the judge's factual findings here? What is the standard for us if we feel that we shouldn't rely on them? So the standard is clear error. There must be clear error in order to reverse or discount a factual finding. And has anybody suggested in the parties that there was clear error on the part of the district court here? No, the school board hasn't argued that there's any error in the factual findings, let alone clear error. And Chief Judge Corrigan, did he make a factual finding that Adams does not use the urinals in the boys' bathroom? He uses the stalls and closes the door so that there's no display of any anatomical differences. Is that a finding of fact in this record? It is, Your Honor. In fact, the court was very clear to talk about the relevant conduct here. Can I ask you a question regarding the shower, the showers? Because my understanding is that in the boys' bathroom, the showers are open. There are no dividers, unlike in the girls' showers where there are, I guess, stalls or dividers in the showers. Yes. So Mr. Adams didn't have any right of access to the locker rooms because he was not enrolled for physical education. That's not my question. My question is, in the record, does it not appear that in the boys' showers, it is open? There is no privacy if a boy is showering. Yes. The other piece of testimony in the record that's relevant, Your Honor, is we had testimony about showers from these other officials that have inclusive policies. And there was an official from Kentucky who said, I went to a big box store, and I spent about $30 buying curtain rods and curtains, and I installed them. And, of course, here they've disclaimed costs entirely. And the lesson of United States v. Virginia is that even if minor alterations are required to facilitate equal access, that is the obligation of the school, although that's certainly not required at all for restroom use. I think maybe I'm confused. Maybe some of us are confused with regard to the boys' restrooms that are relevant to this appeal. I thought there's no showers in the boys' restrooms. That's absolutely correct, Your Honor. Can I follow up on Judge Grant's question in a way just to sort of – I, too, am interested just in testing the limits of the principle here. Is your argument limited to transgender students? And here is just a hypothetical. I hope it's not too far-fetched. But imagine a biological, anatomical boy who is just sort of like truly doesn't fit in with the boys, is bullied by the boys, and begs for an accommodation to participate in the girls' PE class and claims that he will be emotionally traumatized if not allowed to do so. Isn't that likewise discrimination on the basis of sex under your theory? The answer would be quite different. Just explain to me why. So the appropriate response under the school's own code of conduct would be to address the bullying. And, in fact, if the school allowed bullying to persist such that a student couldn't use the appropriate restroom, I think that student would have a Title IX claim. But we have clear evidence in the record about their code of conduct. I don't think bullying – correct me if I'm wrong – but I don't think bullying was part of the issue. I think it was just a sense of extreme discomfort from the student, not because of bullying but because of the atmosphere. Yeah, so just assume – so this is my fault for phrasing the hypo the way I did. I didn't mean to, like, walk myself into a Title IX objection by using the term bullying. But the student just genuinely feels horribly out of place in the boys' PE. Your Honor, I'm not sure I've heard of such a hypothetical student. And it certainly wouldn't speak to a transgender student. The evidence here in this case is that a transgender student is someone who consistently, persistently, and insistently identifies as a sex different than their sex assigned to her. Yeah, and I guess I'm just asking if there was a student who persistently, consistently asserted that I can't emotionally or physically fit in with the boys in the PE class. And it is wrecking me to have to go to the boys' PE class every day. Can I please go to the girls' and the school says no. We separate PE classes by boys and girls. I'm not sure the answer would be to send that student to the girls' locker room, Your Honor. Not locker room, the gymnasium. Just to do kickball or whatever it is that they do in PE. He just says, like, I can't stand being around boys. You know, I just don't fit in with them. And it is emotionally traumatic to me to try. Can I please go to play dodgeball or kickball in the gymnasium with the girls? Well, we do actually have an entry in the best practices guide, Your Honor, that says that the school is supposed to avoid gender separation whenever it can. And so I think the school recognizes that there are circumstances in which it's not necessary to separate the sexes and is moving in the direction of avoiding arbitrary separation. One of the things I am concerned about is I don't believe that I answered the question fully about safety. And if the court would not object, I would like to make sure that I do that. So the question was about – Before you get to that, I mean, we're asking a lot, all these hypothetical and conjectural concerns that we have. Are they, I mean, sufficient to support a policy given our standard of review? No, Your Honor. Because heightened scrutiny applies, we have to test the actual motivations for this governmental – for this classification. And again, what we have here, as the court has pointed out, is a classification that undermines its own interests by sending a boy like Drew into the girls' restroom. Is that exactly why the district court found that the policy was not justified because these concerns are, in fact, hypothetical and conjectural? Exactly right. I mean, the court held a trial to make sure that we had the sharpest adversarial testing of the school's arguments. And its failure to persuade the trier of fact does not create error. Okay. Why don't you address your safety concern? Yes. Thank you, Your Honor. So on the issue of safety, there was discussion about that at the trial. The LGBT task force that studied this issue for several years admitted they had uncovered no safety issues whatsoever in schools that had inclusive policies. And the testimony of the corporate representative was that they had a primary safety concern. That concern was for the transgender students. Their concern was that they didn't want transgender students to be bullied in the restrooms. Now, of course, the answer to that is to ensure that students don't get bullied. But that was their primary concern. Nobody ever suggested that transgender students are more prone to misconduct. And the court specifically found no one's ever contested this factual finding that transgender students are no more prone to misconduct than anyone else. Okay. And I would like to turn on this issue of safety and security. We're all certainly aware, since the briefing was completed, that we have a news report in Virginia dealing with an assault in a girls' bathroom by a student who was born a boy and gender fluid. So, my question is, why do we discount the government's interest just because it hasn't happened? If it's plausible, and now we know in another state it has, in fact, happened, why do we just discount it because, oh, that's never come to pass so far in Florida? Well, Obergefell and Sessions v. Morales-Santana say that the classification has to substantially serve an important governmental interest today. Speculation isn't sufficient. Now, this other incident that, of course, we don't have evidence about in the record appears to be a very complicated, unusual situation. And it did not involve a policy allowing equal access because a policy like that didn't exist at the school. Thank you. There were some unique circumstances about the specific relationship of these two students. And I hesitate to venture any further into it, but it was unique. We've gone considerably over. And you've been answering our questions, but I think you've done so ably. Thank you. Thank you, Your Honor. Ms. Hecker, you've got eight minutes. Before you start, I'd like to ask you to follow up on what co-counsel was saying. Is it the case that we sometimes have boys who assault other boys in the bathroom? For example, sex-assigned boys who gender-identify as boys who assault other sex-assigned boys who gender-identify as boys in the bathroom? Certainly, Your Honor. And that would be taken care of with school discipline policies the way any other discipline issue would be. Thank you. Good morning, Your Honors. May it please the Court, Elizabeth Hecker for the United States. And as my colleague said, I'm happy to answer any questions about either issue, but would like to focus on Title IX, if that's all right with the Court. First, I'd like to explain why the school board violated Title IX by excluding Andrew from the boys' restroom. Now, Bostock tells us that sex discrimination occurs where there are, quote, in treatment that injure protected individuals. Now, this means that sex discrimination occurs when, one, a school treats a student. I don't think there's any dispute here that there's sex discrimination. The question is, what do we make of the living quarters carve-out? The living quarters carve-out, Your Honor? So this is certainly different from living quarters. There are not living quarters at issue here. The regulation, the implementing regulation classifies toilet facilities as a living quarter, right? The regulation has to do with both living quarters and restrooms, but that is not an exception, Your Honor. That's not a safe harbor, as the school terms it. It's not a statutory carve-out. The regulation simply clarifies that the process of separating restrooms by sex does not in and of itself constitute discrimination. And this is for a very simple reason, Your Honor. Assigning cisgender girls to a girls' restroom does not cause cisgender girls harm. Assigning cisgender boys to a boys' restroom does not cause cisgender boys harm. What Bostock tells us is that when you have the two combinations of differential treatment plus harm, that is what gives the— Okay, so then what about my hypothetical about the boy who is harmed by being forced to participate in the boys' PE class? Harmed. Certainly, Your Honor. The harm there would not stem from any incongruence between his sex assigned at birth and his bathroom. No, no, no. Forget about transgender status. I mean, what I'm trying to—I'm trying to figure out whether your theory of sex discrimination leads us beyond discrimination on transgender status. I mean, it sounds to me like my hypothetical, imperfect as it may be, would capture what would constitute sex discrimination under your theory of that phrase. Your Honor, it might—there might be a Title IX violation there depending on the circumstances, and there are a lot of different circumstances that I'm not quite sure of from this hypothetical. But the remedy would not be to send this student to the girls' PE class necessarily. The remedy could be a lot of different things. The remedy could have him join a different PE class for a younger grade for boys. It could have him do a number of things. But it is not necessarily—the only way to remedy that harm is not necessarily to send him to the girls' PE class. Whereas here, the only way to remedy Mr. Adams' harm was to let him use the women's bathroom because the lack of being able to do so was what was harming him. But what— Gender-neutral bathroom to use. I don't understand what the difference is. You're saying with Judge Newsom's hypothetical that there could be another remedy for this boy who feels that consistently and persistently terrible going to the PE class with boys. But he could go to another class where you're suggesting some other remedy for this individual. So here the school board came up with a policy that said you can use a gender-neutral bathroom in order to accommodate you, which is a policy that they came up with after years of dialogue with the LGBTQ community and different members of—from within the school district and outside. So can you explain to me why this would be no different? Certainly, Your Honor. In Judge Newsom's hypothetical, the harm does not come from not being recognized as a girl. The harm for Mr. Adams came from not being recognized as— But it's based on their sex. I mean, at least maybe I'm confused. I guess I'm asking you to forget that there is a class of people called transgender. Forget about it. Certainly. We're just talking about the phrase based on sex. Why does my hypothetical not fit, especially with Judge Lagoa's sort of coda, that there is the gender-neutral bathroom option? Certainly, Your Honor. The gender-neutral bathroom option is not appropriate for Mr. Adams because it singles him out. It treats him as something other than a boy. Any differently than sending my student to the sort of the alternative PE? Yes, Your Honor, because there might be other ways for the school to address that. And, again, I'm not saying that there's no Title IX violation there. There might very well be depending on the circumstances. But the remedy in that case, there are other remedies that could possibly address that student's harm that do not involve sending him to the girls' PE class. But just so we're clear and sort of back to the question that I asked earlier about Title IX, which is a spending clause statute, which the Supreme Court has said requires clear notice, it seems to me we're, like, pretty far down the road now from what a funding recipient might plausibly have understood they were getting themselves into. If they're having to now segregate out potentially, as you've acknowledged, potentially segregate out boys who don't feel at home in the boys' PE class. Certainly, Your Honor. And I'll just point out as a caveat that that argument is forfeited. The school board did not raise it below the Pennhurst-based argument, the spending clause. Rules of interpretation that the Supreme Court says apply to statutes aren't forfeited. That's like saying a defendant would forfeit the rule of lenity, right? Well, in any case, Your Honor, I can explain why the Pennhurst argument is not valid here. School boards have been on notice for years that they must comply with Title IX. And the Supreme Court and Eleventh Circuit precedent make clear that as long as a spending condition has a clear and actionable prohibition on discrimination, it does not matter that the manner of that discrimination may vary widely. And the Supreme Court repeatedly has rejected these very spending clause arguments in the Title IX context. For instance, in Davis v. Monroe County Board of Education involving deliberate indifference to sexual harassment, the statute doesn't clearly spell out that that is covered. The Supreme Court, nevertheless, held that it was covered. Again, Jackson v. Birmingham Board of Education with respect to retaliation, again, the statute does not specifically mention that that is covered. The Supreme Court held that it was covered. And the Supreme Court said, quote, that because the court had consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination, the school board should have known that. Is it a valid rebuttal to say that the Supreme Court got that case wrong? I don't think it is. If that were a valid rebuttal, we'd have lots of options. I kid. I kid. For those in the audience, I argued that case and lost it. Well, what about this case where the Supreme Court said that sex is an immutable characteristic determined solely by the accident of birth? That's Frontier v. Richardson. Can we just ignore that? No, Your Honor, and we certainly agree that sex identified at birth is an immutable characteristic. The rest of that quote in Frontiero, however, goes on to say that the reason it deserves heightened scrutiny is because it so very seldomly bears any relation to what the government is trying to do, and that is precisely the case here. The school board's asserted interest is in privacy, and forcing Mr. Adams out of the boys' restroom does nothing to promote privacy here. Okay. Ms. Heckner, we have your argument. Thank you very much. Thank you, Your Honor. We ask that the Court affirm. Mr. Slanker, you have five minutes. Thank you. Your Honor, I want to just make a few salient points to conclude today. You know, I think that ultimately what this Court is tasked with is looking at what the policy is and determining whether the policy substantially advances important governmental interests. Again, we assert that it does, and to be clear, the policy— I'm sorry. Can you repeat that? I'm sorry. The district court found on this record that it did not advance. It was not the correct fit between the government interests asserted and whether it advanced them. Isn't that what the district court found as a matter of fact on this record? I think that was the district court's legal conclusion. I don't know that it was a factual conclusion. Well, didn't it base it on evidentiary or factual findings that there was no privacy—there was no privacy that was promoted? In fact, it was the opposite here because even though there are barriers in the restroom and more barriers can be erected at no cost to the school board or no real cost to the school board, that the school board itself, by saying that it preferred that transgender students use the unisex bathrooms instead of the birth-assigned bathrooms, wouldn't that, in fact, demonstrate the opposite? And isn't that what the district court found as far as privacy goes? I think that it's a legal issue in terms of whether or not the policy substantially advances an important governmental interest. What is the evidence in this record that shows that the school district's policy advances the two interests that it put forward, safety and privacy? What are the factual findings in this record that support that conclusion? Well, the factual findings in the record are just that the school board was motivated by privacy interests of all students to use the bathroom free from members of the other opposite biological sex. I understand that those were the school's interests, and no one is questioning that those are important interests. Absolutely, I agree. They're legitimate. They're important interests. The question I have for you is what is the evidence that shows that they were advanced and that they were advanced with a substantial fit? Your Honor, they're advanced because the policy does what it set out to do. It separates bathrooms based on biological sex, and it does that perfectly. That's really rather circular. I mean, isn't that circular? You're saying that— You can't defend the policy by restating the policy. The question, I think, is whether or not you've shown that under that standard the policy substantially advances one of your two asserted interests, which are safety and privacy. So how does your policy do that? We assert that it does, Your Honor, because— I know. How? Because there's a privacy interest in using the bathroom separate and apart from the other biological sex. Let me ask it this way. Let me ask it this way. Is there any danger in the policy that you have where the classification is based on sex assigned at birth, biological sex, the terms that have been thrown around this morning? Is there any danger that someone who is of another sex assigned at birth will be exposed to the—what are ordinarily the clothed portions of an opposite-sex student's body? If the policy works the way that it should, there shouldn't be that danger, you know, because one member of the sex is separated from the other member of the sex. And what is the evidence in the record that there is danger that that would be violated if a transgender student uses the bathroom of the gender they identify with and uses the stall, and stalls are installed in all of the bathrooms? Your Honor, I think that you could make that same reasoning and rationale as to a cisgender individual. Then why have a distinction in bathrooms in the first place? Because a biological female will go into the—that identifies as a female would also go into the— Let me ask the question another way, and I know we're running out of time here. Is there any evidence in this record that the privacy of a cisgender boy—any evidence in this record that the privacy of a cisgender boy is violated by Drew Adams' use of the boys' restroom? There's no evidence in the record of that. Is that clear? Your Honor, I guess— And you would have put that evidence on, and you didn't. So there is no evidence. Your Honor, I guess if you want to phrase evidence of a privacy violation to mean exposure to another person's genitals, I don't believe that that's been in the record. It's all conjectural and hypothetical, and if it's conjectural and hypothetical, then it can't justify the policy based on the standard of review that we're bound by, right? Your Honor, I disagree with that, and I disagree with that for this reason. I don't believe that any precedent of the Supreme Court or of this Court has phrased the requirement that a reasoning or justification or a rationale be supported by some type of specific— You don't need to put on any evidence that the privacy interest of a cisgender boy is violated by the presence of a transgender boy in the boys' restroom? You don't need to put evidence on— Your Honor, what can't be hypothetical is the reasoning for the classification. Okay, but the bottom line is there is no—there was no evidence presented, right? Evidence of what? I'm sorry, Your Honor. There's no evidence presented at this three-day trial that the privacy interest of any boy was violated by the presence of Drew Adams in the boys' restroom. None. Again, if you want to say that the privacy interest is in the exposure of the generals to another member of the opposite sex, that wasn't specifically advanced. But we've also advanced the privacy interest that one has a right to use the bathroom, the entirety of the bathroom. And again, the signs are on the outside of the bathroom, separate and apart from the opposite biological sex. So I think there was evidence of that, and the fact that Mr. Adams used the bathroom of the— Chief, can I ask one more? Of the opposite biological sex. Last question. But I want to make clear that the—I think that there's a difference between what is hypothetical in terms of what's intermediate scrutiny review and what's rational basis review. Courts in rational basis review can look at any motivation that could have conceivably motivated a governmental entity— This is an intermediate scrutiny case, right, counsel? Yeah, I just mentioned that to draw the distinction that the reasoning for the classification in intermediate scrutiny review has to be real, but I don't think there's any burden that suggests that schools have to wait and be reactive to an issue before they legislate on it. Okay. Judge Newsom, last question. Last one from me. So what's the best explanation slash justification for what I'll call the enrollment documents control policy, right? So however you get to what it is that you put on the enrollment documents, I think the policy is that controls all the way through. We're not changing after that, right? So what's the school board's best justification for that policy? That the enrollment materials represent a proxy for the traditional understanding of sex. It's usually encompassed by records of physical examination. It's encompassed by a birth certificate. And what the school board attorney said was this hasn't posed a problem in all of the years in which it's been implemented. It's implemented perfectly, and it's perfectly classified every individual. So I think that we can talk about all of these different hypotheticals as much as we want, but there's no evidence that the policy which classifies, again, all students, irrespective of their gender identity based on their biological sex, into one bathroom versus another bathroom. And if the evidence is that it does that perfectly, I don't see how that's not a tight enough fit, especially in light of the Nguyen case, which talked about a classification doesn't have to be perfect and doesn't have to achieve its ultimate objective in every instance. Okay, Mr. Slanker, I think we have your case. Thank you. We will be in recess for 15 minutes.